**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff,<br><br>　　vs.<br><br>SONG GUO ZHENG,<br>　　　　Defendant. | CASE NO.  2:20-cr-182<br><br>CHIEF JUDGE MARBLEY |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The United States of America submits its memorandum regarding Defendant Song Guo Zheng.  For the reasons below, the United States recommends a sentence of 46 months' incarceration, supervised release of 3 years, and restitution in the amount of $3,429,705.22 to the National Institute of Health ("NIH") and $413,664.25 to The Ohio State University ("OSU").

### I.　　BACKGROUND

From June 1, 2013, through April 1, 2020, Zheng produced fraudulent documents and made false statements to secure federal grant money from NIH.  While working at Penn State University ("PSU") and OSU, Zheng concealed a vast array of conflicts of interests which he was required to disclose as a principal investigator on grant applications in an effort to defraud NIH.  Zheng failed to disclose positions with various universities and institutions in the People's Republic of China ("PRC").  He failed to disclose multiple foreign funding sources, including from the PRC's National Natural Science Foundation ("NSFC"), and participation in multiple PRC Talent Plans. He failed to disclose his equity interests or positions with PRC commercials enterprises and up to fifteen patents in China. Defendant's systematic, material omissions over a nearly seven-year period caused NIH to award a total of $3,429,705.22 to fund five research projects.

On May 6, 2020, OSU confronted Zheng with a letter from NIH inquiring as to his foreign support and affiliations.  Defendant responded with a statement from an associate at Sun Yat Sen

University ("SYSU") and documents containing false information to conceal his affiliation with SYSU. Without notice to OSU that he intended to leave or resign, Defendant chartered a private flight to China, with no return flight, scheduled to leave Ted Stevens Anchorage International Airport on May 22, 2020. When he arrived at the airport, Defendant was arrested, and subsequently ordered detained on July 9, 2020. Among the electronics seized at the time of Defendant's arrest were files appearing to be accurate versions of the documents Zheng submitted to OSU. These versions showed his undisclosed affiliations; those he provided OSU did not.

On October 21, 2020, the United States filed an Information that charged one count of submitting false documents, in violation of 18 U.S.C. § 1001(a)(3), and a plea agreement. Defendant pleaded guilty on November 11, 2020. Sentencing is set for May 14, 2021, at 9:00 a.m.

## II. U.S. SENTENCING GUIDELINES AND OBJECTIONS TO THE PSR

The Probation Officer issued a final Presentence Report ("PSR") on March 1, 2021. The PSR recommended the following enhancements in reaching a total offense level of 21: a base offense level 6 (U.S.S.G. § 2B1.1(a)(2)); loss enhancement +16 (*id.* at § 2B1.1(b)(1)(I)); Obstruction of Justice +2 (*id.* at § 3C1.1); and Acceptance of Responsibility: -3 (*id.* at §§ 3E1.1(a) and (b). With a Criminal History Category at I, the resulting range came to 37 to 46 months. Probation did not identify any factors warranting departure from the guidelines range. PSR at ¶ 106. Defendant raises four outstanding objections to the PSR. PSR at PAGEID #: 370–73. As explained below, the Court should overrule the objections.

### Defendant's Objection 1

The parties agree that Defendant caused NIH to transmit $3,429,705.22 through his fraudulent scheme. Doc. No. 13 at PAGEID #: 313. Despite this, Defendant objects to the loss calculation and recommendation for an order of restitution in that amount. Defendant argues that

the research funded was performed, and that a portion of the funding was for administrative and facility costs rather than the research budget under Defendant's control.

Defendant's argument rings hollow because it assumes that his research contains any value to NIH. It does not. Defendant's repeated omissions of his conflicts of interest and undisclosed funding render his research unreliable and unusable according to Dr. Michael Lauer, who serves as the Deputy Director for Extramural Research at NIH and serves as the principal leader and advisor to the Director of NIH on all matters relating to the substance, quality, and effectiveness of the NIH extramural research program. Ex. 1 at ¶¶ 2, 5, 6–8, 12–14.[1] Federal funding for scientific research relies on the foundational principles of transparency, accountability, impartiality, objectivity, and merit-based competition. *Id.* at ¶ 6. NIH's program of evaluating competing grant applications follows those principles, and relies upon the applicants' candor regarding any other funding, affiliations, or potential conflicts they may have. *Id.* at ¶¶ 6-7. Full disclosure of a potential conflict allows NIH to evaluate whether an applicant's research should be funded; concealment undermines confidence in any resulting research. *Id.* at ¶ 8. Therefore, NIH is unable to rely on any research produced in relation to Zheng's grants. *Id.* at ¶¶ 12–14. Instead of receiving the research that they bargained for, Defendant's actions have placed NIH in a situation where millions of dollars and years of research have been wasted.

Defendant's omissions also "wrongfully shift[ed] resources away from important medical research that could prevent, treat, or cure disease." *Id.* at ¶ 7. The diversion of funds to Defendant's projects meant that, necessarily, worthy research projects and their staff went

---

[1] For the benefit of the Court, in addition the statement of Dr. Lauer in Ex. 1, the remaining exhibits attached are: Ex. 2—the letter from OSU to Dr. Lauer detailing OSU's investigation, which Dr. Lauer cited as an exhibit to his affidavit; Ex. 3—Zheng's response to OSU regarding his conduct; and Ex. 4—the real and fabricated cover sheets for an NSFC grant. The Government discusses Exhibits 3 and 4 further in the discussions regarding the obstruction enhancement.

3

unfunded. *Id.* at ¶¶ 15, 17. This harm to NIH's mission has a pecuniary value to NIH that is equal to the amount of funding diverted by the Defendant's conduct. Had NIH been aware of Zheng's undisclosed affiliations, his applications would have been denied. Ex. 1 at ¶ 10. Accordingly, the total calculated loss of $3,429,705.22 is attributable to his conduct. PSR at ¶ 28.

**Defendant's Objection 2**

Defendant objects to restitution in the amount of $413,664.25 is due to OSU. The Probation Officer determined that restitution is due to OSU for a limited set of expenses incurred during the participation in the investigation of Defendant's conduct while employed at OSU. PSR at PAGEID #: 371–72. Based on the PSR and relevant law, this award is proper. *Id.*; *see United States v. Sexton*, 894 F.3d 787, 800 (6th Cir. 2018).

**Defendant's Objection 3**

Defendant objects to the application for an obstruction enhancement under § 3C1.1. This enhancement applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. Conduct may be obstructive even if it occurred prior to the start of the investigation "if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *Id.* cmt. (n.1). Defendant engaged in two courses of action that warrant application of this enhancement.

First, he provided false information in response to OSU's confronting him with NIH's awareness of his affiliations. On May 6, 2020, Defendant was confronted with the fact that NIH was aware of his affiliation with SYSU. PSR at ¶ 48. Defendant minimized his involvement on several NSFC research grants bearing his name, and falsely denied his association with SYSU and

4

the Thousand Talents Plan ("TTP"). Ex. 3 at 1–3. The response also included a forwarded email statement from an individual at SYSU which portrayed Defendant's Chinese grants as expired, applied for without his knowledge, and for the purpose of collaborating with him while he was overseas but without a provision of funding. *Id.* at 3. Defendant's denials of those affiliations were false. *See* Ex. 1 at 9; PSR at ¶ 12–19.

Defendant provided OSU with forged versions of the Chinese grants in question. At the time of his arrest, different versions of the same grants were discovered in the items seized which revealed the forgery. *E.g., compare Ex.* 4 at 1, *with id.* at 2 (annotated NSFC grant #1224 cover sheets, as presented to OSU and as seized). While the identifiers at the top of these documents indicate they are related to the same grant, the content is different. *Id.* The document given to OSU replaced Defendant's SYSU email address with a public email domain and a United States mailing address and altered the timing of the application date to be further in the past. *Id.* This constitutes obstruction under U.S.S.G. § 3C1.1. *Id.*

Additionally, Defendant was well aware that disclosure of his foreign affiliations would result in an investigation and prosecution. Ex. 2 at 27 (February of 2019 e-mail exchange wherein Defendant instructed a foreign collaborator to hide his affiliation on a project document "to protect my safety, my affiliation has only to be listed with US affiliation only now"); PSR at ¶ 31 (In December of 2018, Defendant collaborated with an associate at SYSU to fabricate a letter presented to PSU to alleviate concerns regarding his affiliation with SYSU). Accordingly, even if Defendant was unaware of the criminal investigation, his conduct demonstrates that he contemplated and purposefully calculated the prosecution of his offense, and his obstructive conduct was purposed and likely to thwart that outcome. *See* U.S.S.G. § 3C1.1, cmt. (n.1).

Second, he attempted to flee the United States to thwart his prosecution. On May 19, 2020,

5

just nine days after sending his response to OSU, Zheng chartered a private, one-way flight to China. On Defendant's person and in his luggage at the time of his arrest were two laptops, multiple USB drives, expired Chinese passports for his family, a title deed for property in China (Doc. No. 13-2 at PAGEID #: 172-79), and silver bars. There is one explanation for all of this: through his flight to China, Zheng sought to make himself, as well as the cache of evidence discovered on his person and in his luggage at the time of his arrest, unavailable for the investigation into his offense conduct—and unavailable for any subsequent prosecution and sentencing, which would have been successful but for Defendant's arrest. Because either course of conduct satisfies the requirements of U.S.S.G. § 3C1.1, the enhancement is appropriate and Defendant's third objection should be overruled.

### **Defendant's Objection 4**

Defendant's fourth objection seeks a downward departure under U.S.S.G. § 2B1.1 Application Note #21(C), arguing that the guideline range substantially overstates the seriousness of Defendant's offense. *Id.,* cmt. (n.21(C)). The Application Note advises that it could apply in cases where a substantial loss is diffused over a large population of victims that, individually, suffered minor loss. Here, however, the offense level does not overstate the seriousness of an offense where the harm was a single victim. *See id.* Implicit in the Guideline calculation process is the Sentencing Commission's determination that the relative seriousness of the criminal conduct corresponds to the criminal offense level reached by following the process. *United States v. Murad*, 954 F. Supp. 772, 795 (D. Vt. 1997). Where the conduct occurred over an extended period of time, the offense level does not substantially overstate the seriousness of the offense. *Id.*

Rather than being diffused across many victims, Zheng's crime impacted an immediate victim, NIH, in the amount of $3,429,705.22. PSR at ¶ 28–29. His conduct then came to harm

OSU.  The underlying offense conduct began on June 1, 2013 and continued through April 1, 2020.  Doc. No. 31 at 308–14.  The sustained period of Defendant's conduct militates against a finding that the seriousness of Defendant's conduct is overstated by the offense level.  *United States v. Murad*, 954 F. Supp. at 795.  Here, the harm was compounded: in addition to the pecuniary loss expressed by the intended loss figure, NIH's vital mission was disrupted.  Ex. 1 at 14–15.  For these reasons, all of Defendant's objections should be overruled.

**Government's Objection 1**

The Government's sole objection relates to the Probation Office's failure to apply a two-point enhancement under U.S.S.G. § 2B1.1(b)(10)(B) or (C).  This enhancement applies where a substantial part of the fraudulent scheme was committed from outside America, or for an offense involving sophisticated means.  Both apply here.  Defendant's offense level should be increased from 21 to 23, resulting in an adjusted guideline range of 46–57 months.  *Id.*

For U.S.S.G. § 2B1.1(b)(10)(B) to apply, Defendant need not take action outside the United States, so long as a substantial portion of the conduct occurred outside the United States.  *United States v. Singh*, 291 F.3d 756, 761 (11th Cir. 2002).  Here, the nature of Zheng's offense necessarily required extensive involvement with his foreign affiliates.  Defendant's activities in relation to his offense conduct began in China in March of 2013.  In Zheng's signed TTP application, he indicated a plan "to bring innovate[ive] biological medicine product projects back to China to conduct clinical research on related diseases," and that he "expected to make significant contribution to China's industrialization of biological medicine."  Doc. No. 13-12 at PAGEID #: 214–38.  He also discussed his plan to develop research talent, and that his "team will use the technologies and animal models that the applicant built abroad to promote China's research and cultivate talents in immunology research at SYSU."  *Id.*  In short, he planned to take his research developed through

7

federal grant funding to China to benefit the PRC, creating an undisclosed conflict of interest.

Defendant also collaborated with his foreign associates on at least three occasions as part of his efforts to conceal the true nature of his affiliations. In December 2018, Defendant worked with an SYSU associate to fabricate a letter that he presented to PSU to answer concerns regarding his SYSU affiliation. PSR at ¶ 31. In February 2019, Zheng instructed another overseas associate to edit his credentials on a shared project so as to remove his association with SYSU, stating that they needed to be changed "to protect my safety, my affiliation has only to be listed with US affiliation only now." Doc. No. 13–14 at PAGEID #: 241–44. Finally, in May of 2020, as part of his response to OSU's inquiry based on the information it received from NIH, Defendant provided an email from an associate at SYSU along with his own response. That letter contained false information and corroborated his own false statements made to conceal his true affiliations. *Id.* Accordingly, there is sufficient evidence to support the enhancement.

The enhancement also applies under U.S.S.G. § 2B1.1(b)(10)(C). As discussed, Zheng engaged in a scheme to secure over $3.4 million dollars in funding from NIH over more than six years. His concealment of foreign affiliations and funding was widespread, given that he concealed: 1) his positions with at least five foreign entities (Ex. 2 at 2, 4); 2) participation in multiple PRC talent programs (*id*. at 2, 4); 3) foreign grant funding (*id.* at 2); 4) up to 15 Chinese patents (*id.* at 2, 7); and 4) equity interests and/or employment at PRC-based companies (*id.* at 2, 5). Not only did he collaborate with his foreign employers to create false documents and statements to further his fraudulent scheme and obstruct justice, but he actively concealed his affiliation with SYSU in publications. *Id*. at 6–7. While a simple omission might not trigger this enhancement, Defendant's scheme was an ongoing, transcontinental venture in concealment involving multiple people and multiple concealments beyond those in grant applications. This

scheme required expert knowledge in medical research and navigating the particulars of NIH grant applications. Accordingly, the enhancement should be applied.

### III. ANALYSIS AND RECOMMENDATION OF THE UNITED STATES

Based on the § 3553(a) factors, the Government recommends a sentence of 46 months' incarceration, supervised release of 3 years, and restitution of $3,429,705.22 to NIH and $413,664.25 to OSU.

**A. Nature and Circumstances of the Offense; Seriousness of the Offense; Respect for the Law; Provide for Just Punishment.**

On March 12 of 2013, Defendant signed his application to become a member of China's TTP. In his application, Defendant stated that he intended to come to the United States and return to China with innovative research products and newly trained research assistants. Rarely does an investigation uncover a document where a defendant makes a clear statement of intent of his planned criminal conduct, and then executes that plan over the course of close to seven years. Defendant's offense is serious. As an experienced researcher who had agreed to abide by his disclosure requirements, Defendant knew exactly what he was doing. The measures he took to avoid detection—creating false documents, making additional false statements, enlisting his foreign affiliates to corroborate his fabrications or scrub his true affiliations from project documents—all further demonstrate his awareness of the criminality of his actions.

The United States was harmed by Defendant's conduct. The pecuniary loss to NIH of $3,429,705.22 is compounded by the lost opportunities to fund legitimate research. Given NIH's limited budget, it can only fund 20% of the applications it receives each year. Ex. 1 at 15.

**B. Deterrence of Criminal Conduct**

While Defendant's true affiliations are now public, he is hardly the only TTP member in the United States. It is estimated that the PRC has recruited over 7,000 experts in a wide range of

9

fields, through its talent plans, to collect foreign research and other data and further the policy directives of the PRC.[2] Zheng worked to carry out a very small part of those policy directives—policy directives that currently pose "[t]he greatest long-term threat to our nation's . . . national security."[3]  No sentence will deter the PRC Government.  But this case represents an opportunity—because of the nature of the conduct in this case, because of the number of people similarly situated to Zheng—to deter many other individual researchers who could be tempted by the PRC to cross a line they shouldn't.  While in the short-term, the individual stakes of this case might seem low, the long-term stakes of all the cases like this one, in the aggregate, are high.  The United States has a strong national-security interest in curbing the unauthorized, unintended subsidizing of foreign research and development with U.S. taxpayer dollars that is now underway.

## C. Restitution

The parties have agreed that Defendant's conduct caused NIH to transmit $3,429,705.22 of government funding.  Doc. No. 31 at PAGEID #: 313.  The PSR determined that loss amount to be the appropriate restitution owed to NIH, and that $413,664.25 is owed in restitution to OSU for expenses incurred in relation to the investigation of Zheng.  The Government concurs.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence Defendant to a term of imprisonment of 46 months, supervised release of 3 years, and restitution in the amount of $3,429,705.22 to NIH and $413,664.25 to OSU.

---

[2] U.S. Senate Comm. on Homeland Sec. & Gov't Affairs, Perm. Subcomm. on Investigations, "Threats to the U.S. Research Enterprise: China's Talent Recruitment Plans" (Nov. 18, 2019) at 2, *available at* https://www.hsgac.senate.gov/imo/media/doc/2019-11-18%20PSI%20Staff%20Report%20-%20China's%20Talent%20Recruitment%20Plans.pdf (last visited April 21, 2021).

[3] Chris Wray, Hudson Institute Remarks, July 7, 2020, "The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National Security of the United States," *available at* https://www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states (last visited April 21, 2021).

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

s/S. Courter Shimeall
S. COURTER SHIMEALL (0090514)
Assistant United States Attorney
s/Christopher N. St. Pierre
CHRISTOPHER N. ST. PIERRE (0097673)
Special Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email: Courter.Shimeall@usdoj.gov
      Christopher.St.Pierre@usdoj.gov

JOHN C. DEMERS
Assistant Attorney General, National Security Division
s/Matthew McKenzie
MATTHEW MCKENZIE (NY Bar #4791513)
Trial Attorney
U.S. Department of Justice National Security Division
Counterintelligence & Export Control Section
950 Pennsylvania Ave NW
Washington, DC 20530
Phone No.: (202) 514-7845
Email: Matthew.McKenzie@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum was served electronically via the Court's CM/ECF system on this 23rd day of April, 2021 upon counsel for Defendant Song Guo Zheng.

s/Christopher N. St. Pierre
CHRISTOPHER N. ST. PIERRE (0097673)
Special Assistant United States Attorney