UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>SONG GUO ZHENG,<br>Defendant. | CASE NO. 2:20-cr-182<br><br>CHIEF JUDGE ALGENON L. MARBLEY |

## DECLARATION OF DR. MICHAEL S. LAUER

MICHAEL S. LAUER, M.D., states on personal knowledge and under penalty of perjury:

1. I am a board-certified cardiologist, an elected member of the American Society of Clinical Investigation, and an elected fellow of the American College of Cardiology and the American Heart Association.

2. I have been the Deputy Director for Extramural Research at the National Institutes of Health (NIH) since 2015. I submit this Declaration to assist the Court in assessing the harm caused by the criminal conduct in this case.[1]

3. I graduated from Albany Medical College in 1985. I completed an internship and residency in medicine at Massachusetts General Hospital and Harvard Medical School, and then was a Clinical Fellow in Medicine (Cardiology) at Harvard Medical School and Beth Israel Hospital in Boston. I also served as a Research Fellow in the Framingham Heart Study at Boston University Medical School in Framingham, Massachusetts. I was in clinical practice at the Lahey

---

[1] This Declaration highlights some of the most significant considerations in this specific case from the perspective of NIH. This Declaration does not set forth a comprehensive analysis of every aspect of the criminal conduct at issue, and does not address considerations that are not relevant in this case.

1

Clinic in Burlington Massachusetts from 1991 to 1993. I then spent 1993–2007 in various leadership roles at the Cleveland Clinic, including serving as a Professor of Medicine, Epidemiology, and Biostatistics at the Clinic's Lerner College of Medicine of Case Western Reserve University.

4. I started at NIH in 2007 as the Director of the Division of Prevention and Population Science at the National Heart, Lung, and Blood Institute (NHLBI), and from 2009 until 2015 served as the Director of the Division of Cardiovascular Sciences at the NHLBI.

5. In 2015, I became the Deputy Director for Extramural Research at NIH, and still serve in that role. As Deputy Director for Extramural Research, I serve as the principal scientific leader and advisor to the Director of NIH on all matters relating to the substance, quality, and effectiveness of the NIH extramural research program and administration and oversee NIH's Office of Extramural Research (OER). The OER provides the corporate framework for NIH research administration, ensuring scientific integrity, public accountability, and effective stewardship of the NIH extramural research portfolio. It oversees activities related, but not limited to, high-profile digital platforms, grant compliance, peer review, communications with the extramural community, scientific misconduct, human subjects protection, and laboratory animal welfare.

6. Scientific and technological research in the United States is essential to U.S. innovation, leadership in science and technology, economic vitality, and national security. A significant way in which the U.S. Government supports such research is through federal funding. The success of the U.S. enterprise depends on foundational principles and values such as openness and transparency, accountability and honesty, impartiality and objectivity, respect, freedom of inquiry, reciprocity, and merit-based competition for research support.

7. These fundamental values are important to, among other things, promoting optimal allocation of resources. For the Court's awareness, NIH can only fund approximately twenty percent of the proposals it receives. An applicant's concealment of or failure to disclose funding that the applicant's research is already receiving skews NIH's assessment of that applicant's need for economic support. This can cause NIH unwittingly to devote resources to research that is already funded, thereby depriving another meritorious applicant of research funding. That, in turn, harms not only the researcher who does not receive funding, but also NIH's entire program of evaluating and prioritizing scientific research, as well as the potential beneficiaries of research that would otherwise have been funded. Simply put, such concealment or nondisclosure wrongfully shifts resources away from important medical research that could prevent, treat, or cure disease.

8. The same values help NIH avoid funding research that is compromised by conflicts of interest. Undisclosed or concealed external funding or other financial interests can significantly impair the integrity and objectivity of scientific and technical research. When a grant application fully discloses such interests, NIH can make fully informed decisions about whether to fund an applicant's research and whether to require modifications to the proposal that would protect the integrity and objectivity of that research. Withholding that information undermines confidence in the resulting research, which diminishes its usefulness and deprives NIH and the United States of the benefit of federally funded projects.

9. In this case, NIH awarded grants to the Ohio State University (OSU) in which Song Gou Zheng (Zheng), then a professor of Internal Medicine and the Ronald L. Whisler Chair in Rheumatology and Immunology at OSU, served as the Principal Investigator: R61 AR073049 and R01 AR059103. Through correspondence with OSU, I learned that Zheng failed to disclose the following information in grant applications he caused to be submitted:

a. Affiliations with at least five foreign entities to include: Professor at Third Affiliated Hospital, Sun Yat-sen University; Adjunct Professor at Fudan University and Haushan Hospital Affiliated with Fudan University; Director, Fudan University Institute of Rheumatology, Immunology and Allergy; Research Team Instructor at "Zheng Songguo Expert Work Station" Qujing No. 1 Hospital; and Distinguished Professor, Guilin Medical University;

b. Previous and/or current participation in numerous People's Republic of China (PRC) foreign government talent recruitment programs, including in the Sun Yat-sen University's Hundred Talents Program;

c. Receipt of foreign funding for research, including grant funding from the PRC's National Natural Science Foundation;

d. Patents in the PRC;

e. Equity interests or employment with private companies including service as chief scientist at VitaLife Biotechnology Company.

10. Had NIH been aware of Zheng's affiliations with PRC Universities, participation in PRC programs, receipt of foreign funding for research, patents in the PRC, and equity interests or employment with private companies, it is almost certain that the NIH would not have funded these grants or would have substantially renegotiated them.

11. Furthermore, had NIH been aware that Zheng's applications were not true, complete, and accurate to the best of his knowledge, in violation the NIH's Grants Policy Statement (GPS) 2.3.7.6, NIH would have sought to have Zheng removed as the Principal Investigator and/or taken other compliance actions pursuant to NIH GPS 8.5.1 and NIH GPS 8.5.2.

12. Zheng's failure to fully disclose his conflicts of interest and additional foreign funding caused concrete harm to NIH and the U.S. research enterprise.

13. First, Zheng's lack of candor in his application calls into question the validity of his entire research. As a result, the NIH is not able to rely on any of the research produced by Zheng. NIH is now undertaking a detailed review of all of Zheng's NIH-funded work to identify potential falsification, fabrication, or plagiarism.

14. Second, Zheng's unreported conflicts of interest, in themselves, call the scientific integrity and objectivity of his research into question. NIH's policies regarding conflicts of interest were established to ensure that the NIH receive objective, unbiased research. Researchers who have a financial stake in the outcome of particular research may have incentives to design, conduct, and report their research in a biased manner which furthers their financial goals. Based on Zheng's failure to disclose these conflicts of interest, the NIH, through OSU, will have to complete a retrospective review of his research to determine the objectivity of the science, effectively requiring an objective third-party to recreate Zheng's research, which may lead to additional time and money being dedicated to this project.

15. Third, by virtue of funding Zheng's research, NIH necessarily did not fund other research. On an annual basis, the NIH receives upwards of 67,000 applications for research grants. Due to limited resources, the NIH is only able to fund approximately 20 percent of those requests. As a result, worthy applications are necessarily denied.

16. Fourth, Zheng applied for several patents in the PRC. A review of those patent applications reveal significant overlap with NIH-funded research. All potential intellectual property rights for research funded by the NIH belong to the university to which the funding was given. By applying for foreign patents without reporting these applications to the NIH or his

university, Zheng both prevented his university from having the opportunity to patent the research itself and adversely affected the NIH's role in stimulating academic research in the United States.

17. Fifth, NIH will now seek to be reimbursed for salary support provided to OSU for Zheng's grants. In addition to the effort required to recoup this money, NIH was harmed by not providing this salary to other, worthy, researchers.

18. Attached to this Declaration are true and correct copies of the following exhibits:

    a. Exhibit 1: Letter from The Ohio State University, dated October 9, 2020

    b. Exhibit 2: National Institutes of Health Grants Policy Statement, December 2019

19. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on **January 29, 2021**.

_____
MICHAEL S. LAUER, M.D.