## UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  March 10, 2022

Mr. Steven S. Nolder
65 E. State Street
Suite 200
Columbus, OH 43215-0000

Ms. Alexis J. Zouhary
Office of the U.S. Attorney
221 E. Fourth Street, Suite 400
Cincinnati, OH 45202

Re:  Case No. 21-3513, *USA v. Song Zheng*
Originating Case No. : 2:20-cr-00182-1

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0046p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SONG GUO ZHENG,

*Defendant-Appellant.*

> No. 21-3513

———————————

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cr-00182-1—Algenon L. Marbley, District Judge.

Decided and Filed:  March 10, 2022

Before:  BATCHELDER, NALBANDIAN, and READLER, Circuit Judges

———————————

### COUNSEL

**ON BRIEF:**  Steven S. Nolder, Columbus, Ohio, for Appellant.  Alexis J. Zouhary, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

———————————

### OPINION

———————————

NALBANDIAN, Circuit Judge.  Song Guo Zheng lied on several applications for National Institute of Health (NIH) funding while employed at some of the country's largest universities.  Zheng pleaded guilty to fraudulently obtaining this federal funding, but on appeal argues that his trial counsel was ineffective by not seeking a downward variance at sentencing given his immigration status.  Generally, however, we decline to review ineffective-assistance claims for the first time on direct appeal because the record is inadequate to establish any error.

No. 21-3513                      *United States v. Zheng*                      Page 2

Seeing no reason to depart from this practice, we **DISMISS** Zheng's ineffective-assistance claim.

## I.

Agents from U.S. Customs and Border Patrol confronted Song Guo Zheng after he arrived at the international airport in Anchorage, Alaska carrying a large amount of luggage, several electronic devices, bars of silver, his family's expired Chinese passports, and a one-way ticket to China.[1]  FBI agents questioned Zheng, whom they had been investigating for nearly a year, and recovered more evidence helpful to their investigation into his fraudulent NIH applications.  The jig was up.

On the surface, Zheng had been a successful researcher and professor for years.  Born a Chinese citizen, Zheng became a permanent United States resident in 2004.  He served as a professor at the University of Southern California for nearly a decade, then at Pennsylvania State University from 2013 to 2019, before The Ohio State University hired him in 2019.  During his time at USC, PSU, and OSU, Zheng performed research under federally funded grants from NIH.  To receive NIH funding, universities submit detailed applications that must include, among other things, several disclosures.  Both during the application process and after receiving an award, funding recipients must disclose to NIH all foreign collaborations, sources of foreign research support, conflicts of interest, and the like.

But as it turns out, this was a problem for Zheng.  He had many ties to Chinese organizations and these ties were both financial and information-sharing.  To start, take the Chinese Talent Plans (CTP).  Zheng became a member of both the CTP Hundred Talents Plan (HTP) and the CTP Thousand Talents Plan (TTP).  These programs aim to recruit researchers to share developments with the Chinese government.  For instance, in his application for the TTP, Zheng wrote that "biomedical products are basically monopolized by USA, Europe and Japan; the applicant will bring back several innovative products and conduct clinical transformation of the products in hoping to develop China's brand in the biomedical area."  (R. 38, PSR at 6,

---

[1]At sentencing, neither party objected to the factual statements in the Presentence Report, so the district court adopted those statements as its findings of fact.  (R. 53, Sentencing Tr. at 5, PageID #854.)

PageID #327.)  What's more, memberships in HTP and TTP allowed Zheng to set up a clinic at Sun Yat-sen University (SYSU) with funding from the Chinese government.  He also joined the Pearl River Talent Plan; this membership included more than three million dollars in funding for Zheng.  And Zheng received foreign grants from the National Natural Science Foundation of China (originally under the jurisdiction of China's State Council and now managed by China's Ministry of Science and Technology) and sought out other funding from ten Chinese biotechnology companies.

Including this information on NIH applications would have been fatal to Zheng's funding prospects.  So Zheng clouded his ties to China and these organizations.  From 2013 to 2019, Zheng repeatedly applied for and was awarded NIH funding.  On none of these applications did Zheng disclose his ties to Chinese organizations, his conflicts of interest, or his foreign funding. At one point, Zheng directed an OSU employee to submit an application with false representations to NIH.  All told, Zheng's fraudulent statements caused PSU and OSU to falsely certify to NIH that Zheng was free from conflicts of interest on eight applications and eight other reports.  After all, each of these documents included a certification from Zheng that the statements in them were true.  As a result of Zheng's fraudulent statements and documents, NIH awarded Zheng two grants totaling $3,919,561.83.

Zheng's deception went on for years before anyone caught on.  First, in late 2018, PSU confronted Zheng after an internal investigation flagged Zheng's connections to SYSU.  But Zheng worked with a contact at SYSU to draft a false statement about Zheng's ties to SYSU and alleviate PSU's concerns.  By 2019, the FBI began investigating Zheng.  Eventually agents contacted OSU, who began their own investigation.  Finally, in May 2020, OSU informed Zheng they were conducting an administrative proceeding into Zheng and his NIH grants.  Six days later, Zheng left Columbus for China before federal agents apprehended him in Anchorage.

All in all, Zheng pleaded guilty to a one-count information charging him with making false statements in violation of 18 U.S.C. § 1001(a)(3).  While the plea agreement included an appellate waiver, that waiver does not bar a claim for ineffective assistance of counsel.  At Zheng's sentencing, his counsel objected to several enhancements in the Presentence Report and sought a downward departure under U.S.S.G. § 2B1.1, arguing that the research Zheng

completed offset the amount of money lost.  Unconvinced, the district court overruled these objections (and an objection by the government seeking another enhancement) and found Zheng's offense level to be 21 with a criminal history category of I.

Next the parties touched on the § 3553(a) factors in their respective arguments about the length of the sentence.  Here Zheng's immigration status came up for the first time.[2]  The government shared that the parties had discussed the consequences of Zheng's immigration status and asked the district court that, if the court decided to sentence Zheng to time served, it tack on at least three days because Immigration and Customs Enforcement was unavailable to pick Zheng up until the next Monday.  In the end, the district court sentenced Zheng to 37-months imprisonment, the low-end of his Guidelines range, which was 37 to 46 months.  Zheng timely appealed.

## II.

On appeal, Zheng argues that his counsel was ineffective by not seeking a downward variance based on Zheng's immigration status as a deportable alien.  A defendant's deportable alien status, as Zheng argues, affects the execution of his sentence.  For instance, Zheng points out that deportable aliens populate more secure prison facilities, serve a larger percentage of their sentence in custody, are ineligible for halfway house placement, and cannot take part in some Bureau of Prisons (BOP) programs.  *See United States v. Ebolum*, 72 F.3d 35, 37 (6th Cir. 1995) (noting the Bureau of Prisons' policies for deportable aliens); *see also United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994) ("[A] downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence . . . .").  According to Zheng, his counsel should have raised these points to the district court to receive a shorter sentence.

---

[2]The Presentence Report (that Zheng and his counsel reviewed before sentencing) also noted that the Department of Homeland Security had advised Zheng that he was subject to removal proceedings that would begin after his case.

No. 21-3513                          *United States v. Zheng*                          Page 5

### A.

To prove a Sixth Amendment violation under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must make two showings. First, he must show that his counsel's performance "fell below an objective standard of reasonableness" by identifying "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 688–90. Second, the defendant must show prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Here, Zheng brings his claim of ineffective assistance of counsel for the first time on direct appeal. "We typically decline to address claims of ineffective assistance on direct appeal and instead require defendants to file a postconviction motion to vacate their sentence pursuant to 28 U.S.C. § 2255." *United States v. Hynes*, 467 F.3d 951, 969 (6th Cir. 2006); *accord Massaro v. United States*, 538 U.S. 500, 504 (2003) ("[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance."). Section 2255 proceedings serve as the best forum for these claims because "the record regarding counsel's performance can be developed in more detail." *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006). That said, we have recognized a "narrow exception" to this rule "when the existing record is adequate to assess properly the merits of the claim." *Hynes*, 467 F.3d at 969 (quoting *United States v. Franklin*, 415 F.3d 537, 555–56 (6th Cir. 2005)).

So before analyzing Zheng's claim under *Strickland*'s two-prong analysis, we must first determine whether the record here is adequate to assess Zheng's claim. Most of Zheng's briefing highlights the difference between how BOP treats deportable aliens and other inmates. But absent from the briefing is any evidence of counsel's deficiency in representing Zheng. Nothing in our record shows, for example, counsel's reasons for making certain strategic decisions or why he advanced one argument over another. Thus, this is not the kind of case that falls within the "narrow exception" to our general practice.

## B.

Perhaps realizing the record here cannot support his claim under our caselaw, Zheng looks elsewhere—to a recent opinion from the D.C. Circuit. In *United States v. Thomas*, the D.C. Circuit (on direct appeal), after determining that trial counsel's performance was unreasonable, remanded the defendant's immigration-related ineffective-assistance claim for an evidentiary hearing on prejudice. 999 F.3d 723, 735–38 (D.C. Cir. 2021). Thomas's claim was like Zheng's.

The D.C. Circuit has recognized specifically that deportable aliens may be eligible for a downward variance called a *Smith* variance. *See id.* at 736. *Smith* allows for a downward variance solely because deportable aliens face the prospect of objectively more severe prison conditions. 27 F.3d at 650. And as Zheng emphasizes, in *Thomas* the court found that the "record conclusively show[ed] Thomas's counsel made unprofessional errors in failing to seek a downward variance due to [his] status as a deportable alien." *Id.* at 736. Zheng argues that "consistent with the remedy announced in *Thomas*" we should remand his claim so the district court may consider his argument. (Appellant Br. at 33–34.)

But *Thomas* is different from Zheng's case for at least two reasons. First, we don't have a case like *Smith* in this circuit. Instead, we have taken a different approach. *See United States v. Petrus*, 588 F.3d 347 (6th Cir. 2009). In *Petrus*, we evaluated the reasonableness of a sentence imposed on a non-citizen. *Id.* at 351–57. Mindful of the fact that we do not want to categorically tie the hands of district courts in granting downward variances, we observed that a sentencing court looking at the defendant's immigration status could come to "two opposite conclusions" from the fact that the defendant faces deportation. *Id.* at 356. On one hand, "potential deportation and fewer prison opportunities should be a reason for a downward variance." *Id.* But on the other hand, "a person granted the benefit of entry to the country should be subject to an upward variance for abusing the privilege." *Id.*; *see also United States v. Ocon-Fierro*, 425 F. App'x 457, 459 (6th Cir. 2011) (citing *Petrus* and recognizing both possibilities); *United States v. Chowdhury*, 438 F. App'x 472, 476–77 (6th Cir. 2011) (same). Either conclusion, depending on the facts of the case, is within the sentencing court's discretion. *Petrus*, 588 F.3d at 356.

By recognizing two potential implications for a defendant's immigration status, *Petrus* implicitly rejected *Smith*'s more absolutist approach. That being the case, *Petrus* hurts Zheng's case. By recognizing that a sentencing court has an avenue for either an upward or downward variance, we have presented an attorney with a classic strategic choice under *Strickland*.

Second, Thomas confronted a different factual scenario. In *Thomas* the record "conclusively" showed that counsel "made unprofessional errors" by not seeking a downward variance because of Thomas's deportable alien status. 999 F.3d at 736.[3] Thomas's Presentence Report explicitly mentioned the potential sentencing effects of Thomas's deportable alien status.[4] *Id.* Moreover, the district court had asked counsel directly about *Smith*; counsel said he would address the issue but then failed to do so. *Id.* at 737. That record allowed the appellate court to conclude that the decision not to raise *Smith* was unreasonable, and not a strategic choice. Here, we don't have similar record evidence to decide whether Zheng's counsel made an error or a strategic choice. If anything, given our prior statements, we do have a possible explanation for why counsel may not have raised the issue—a potential upward variance. A § 2255 proceeding would allow Zheng to develop the record to best make his claim. *See United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012).

### III.

This is neither the right tribunal nor the right time for Zheng's claim. *See Guinan v. United States*, 6 F.3d 468, 474 (7th Cir. 1993) (Easterbrook, J., concurring). For the above reasons, we decline to address Zheng's claim of ineffective assistance without a properly developed record.

---

[3]It also appears that, unlike in our court, when defendants assert an ineffective-assistance claim on direct appeal in the D.C. Circuit, the court's "general practice is to remand the claim for an evidentiary hearing" unless the trial record "conclusively shows" whether relief is warranted. *United States v. Rashad*, 331 F.3d 908, 909–10 (D.C. Cir. 2003) (internal quotation omitted).

[4]Perhaps this is because the D.C. Circuit has the *Smith* variance and their court allows for these downward variances as a regular course. But that undercuts Zheng's argument that *Petrus* does for our circuit what *Smith* does in the D.C. Circuit. Zheng's Presentence Report does not mention *Petrus* or this possible ground for a downward variance.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-3513

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

SONG GUO ZHENG,

    Defendant - Appellant.

> **FILED**
> Mar 10, 2022
> DEBORAH S. HUNT, Clerk

Before:  BATCHELDER, NALBANDIAN, and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that Song Guo Zheng's ineffective-assistance claim is DISMISSED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk